# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

# COLUMBIA DIVISION

| | | |
|---|---|---|
| FRANK HEINDEL; and PHIL LEVENTIS, | ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) ) | |
| MARCI ANDINO, Executive Director of the South Carolina State Election Commission, in her official capacity; BILLY WAY, JR., Chair of the South Carolina State Election Commission, in his official capacity; and MARK A. BENSON, MARILYN BOWERS, and NICOLE SPAIN WHITE, Members of the South Carolina State Election Commission, in their official capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 3:18-cv-01887-DCC<br><br>Defendants' Memorandum in Support of Motion for Summary Judgment |
| Defendants. | ) | |

# DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Alan Wilson, Fed. Bar No. 10457
W. Jeffrey Young, Fed. Bar No. 6122
Robert D. Cook, Fed. Bar No. 285
Thomas Parkin C. Hunter, Fed. Bar No. 2018
Harley Littleton Kirkland, Fed. Bar No.

OFFICE OF THE SOUTH CAROLINA ATTORNEY GENERAL
Post Office Box 11549 Columbia, South Carolina 29211-1549
jyoung@scag.gov
bcook@scag.gov
phunter@scag.gov
hkitkland@scag.gov

/s/ Thomas Parkin C. Hunter
Senior Assistant Attorney General
Attorneys for all Defendants

1

## BACKGROUND

This Motion for Summary Judgment is made without supporting affidavits because there is nothing in the pleadings filed in this action that requires extraneous documents for this Court to make its decision to dismiss this action with prejudice. From reading the Complaint, you can learn about the voting systems used by Florida and Ohio more than ten years ago as well as potential vulnerabilities with regard to the iVotronic/DRE voting system used by South Carolina and many other states, but even accepting its allegations as true, there is nothing that justifies this Court intruding into what is strictly a state matter based on mere conjecture and speculation about the future.

Plaintiffs assert violations of their right to vote based on the constitutional rights of due process and equal protection. However, they do not allege that they were treated differently than other voters or that their votes were diluted as compared to others, that election officials refused to count their votes or failed to follow state election procedures or otherwise violated state election law. The gist of their allegations is that South Carolina's election machinery and the State's procedures with regard to voting are subject to vulnerabilities and outside interference. "The reliability of that basic element of democracy is under extraordinary stress across the country as election systems face threats posed by hackers, who may seek to gain unauthorized access to data or computer systems to mount cyberattacks aimed at manipulating, damaging, or destroying those systems." Complaint, Paragraph 1. There are no allegations that relate the actions of any of the Defendants to the claims of the Plaintiffs. The Defendants are not responsible for hacking, if any, of the voting machines, or any criminal activity that may take place at the polling places.

Plaintiffs would prefer that this Court force South Carolina to conduct elections in accordance with their view of how things should be done (paper ballots or different machines that produce a paper trail). However:

> The Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections. *Sugarman v. Dougall,* 413 U.S. 634, 647, 93 S.Ct. 2842, 2850, 37 L.Ed.2d 853 (1973); *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 217, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986). Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974).

Burdick v. Takushi, 504 U.S. 428, 433, 112 S. Ct. 2059, 2063, 119 L. Ed. 2d 245 (1992) (absentee voting).

More specifically, "'the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections.'" *Gregory v. Ashcroft,* 501 U.S. 452, 461–462, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (quoting *Sugarman v. Dougall,* 413 U.S. 634, 647, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973). Absent a violation of federal law, states retain authority to regulate their elections: "States have broad powers to determine the conditions under which the right of suffrage may be exercised." *Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612, 2623, 186 L. Ed. 2d 651 (2013) (citing *Carrington v. Rash,* 380 U.S. 89, 91, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965)) (internal quotation marks omitted). Nevertheless, "[s]tate legislation may not contravene federal law." *Id.*

Frank Heidel and Phil Leventis (jointly, "Plaintiffs") bring this action without meeting the basic constitutional standard of standing. They do not allege any appropriate particularized injury and rely solely on speculation with regard to future possible election interference with regard to South Carolina and themselves. This is clear from the Complaint and the attachments. The lawsuit seems to be brought on the basis of feelings and platitudes rather than any

particularized injury. The lawsuit is based on potential vulnerabilities because South Carolina's system of voting does not produce a paper trail for audit purposes and claims of security vulnerabilities at the polling place. The Plaintiffs want this Court to issue an order to modify the voting system adopted in South Carolina by the State Election Commission in accordance with the requirements prescribed by the General Assembly in Title 7, Chapter 13, and in compliance with the competitive bidding procedures mandated in the South Carolina Procurement Code, to one they prefer on the basis of hypothetical vulnerabilities in South Carolina's electoral system. See S.C. Code Ann. § 7-13-1620: See <u>Exhibit A</u> for summary of South Carolina statutes that relate to voting machines.

> (A) Before any kind of voting system, including an electronic voting system, is used at an election, it must be approved by the State Election Commission, which shall examine the voting system and make and file in the commission's office a report, attested to by the signature of the commission's executive director, stating whether, in the commission's opinion, the kind of voting system examined may be accurately and efficiently used by electors at elections, as provided by law. A voting system may not be approved for use in the State unless certified by a testing laboratory accredited by the Federal Election Assistance Commission as meeting or exceeding the minimum requirements of federal voting system standards.

S.C. Code Ann. § 7-13-1620.

There are not any allegations that the currently used system, hereafter referred to as the "iVotronic System" or the "DRE System" was not properly reviewed and adopted in South Carolina.

No one disagrees with the many platitudes set forth in the Complaint starting with the first sentence in the Complaint which includes the following:

> 1. The right to vote is the cornerstone of our democratic system of government, a fundamental guarantee that preserves all other rights.
>
> 2. At an irreducible minimum, this means ensuring that the machinery of democracy has the capacity to record and count each vote consistently, fairly, effectively, and accurately.

4

> 3. The reliability of that basic element of democracy is under extraordinary stress across the country as election systems face threats posed by hackers, who may seek to gain unauthorized access to data or computer systems to mount cyberattacks aimed at manipulating, damaging, or destroying those systems.

Plaintiffs assert that "The problem is especially acute in South Carolina." See Paragraph 1 of the Complaint. In Paragraph 9 of the Complaint, the Plaintiffs assert:

> Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted. . . ." *United States v. Classic*, 313 U.S. 299, 315 (1941). And as the Supreme Court has long understood, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

We do not challenge these basic precepts here. We do challenge the Plaintiffs' claim that this Court should issue an order as set forth in the prayer for relief based on wholly unsubstantiated allegations. See Complaint. In particular, Paragraph 3 of the Prayer for Relief of the Complaint asks that this Court "Enjoin Defendants from maintaining an election system that fails to reliably record and tabulate votes."

There is no reason to believe that a system thrown in at the last minute, as compliance with a court order as requested by the Plaintiffs would require, would necessarily be any more reliable than the current system which has been reviewed and adopted by statutory processes in place in South Carolina.

As a matter of note, Plaintiffs allege that the current system cost $35,000,000 and was deployed in 19 counties in November 2004 and appeared statewide in 2006. Complaint, Paragraph 23. The procurement originated with a Request for Proposals in 2004 and the contract was awarded in August 2004. The Plaintiffs describe the process as "contentious." Complaint, Paragraph 22. Plaintiffs ask this Court to "Impose injunctive relief requiring Defendants to

5

ensure that Plaintiffs have access to a voting system that will reliably and accurately record and count their votes[.]" Paragraph 2 of the Prayer for Relief. As a practical matter, if this Court determines that relief is required, which the Defendants deny, any substitute system must be determined and implemented before the election this November.

As a practical matter, Plaintiffs have repeatedly used this system. Plaintiff s "are registered voters who regularly vote in person on iVotronic machines." Complaint, Paragraph7.

## The Untold Story

It is interesting that Plaintiffs request the relief set forth in the Prayer for Relief without mentioning the procedures in place in South Carolina in their entire 45 page Complaint and the voluminous exhibits filed that deal with problems such as machine malfunctions and vote overcounts and undercounts. They do mention §§ 7-13-1655, 7-13-1620 (Commission responsible for approving and adopting a voting system), § 7-13-1620(H) (duty to decertify a system that no longer meets requirements), § 7-3-10 (composition of the Commission), and § 7-3-20(C)(1) (supervisory duties of the Commission). The Plaintiffs admit in Paragraph 124 of the Complaint that "While the Constitution does not require a state to guarantee perfect accuracy or impregnable safeguards in its election systems, it does require a level of reliability that votes will be accurately counted, and that voters will not face arbitrary and disparate treatment."

Regardless, Plaintiffs do *not* allege that they were treated differently than other voters or that their votes were diluted as compared to others, that election officials refused to count their votes or failed to follow state election procedures or otherwise violated state election law.

In fact, South Carolina's statutes with regards to voting machines are found in Title 7, Chapter 13, and codified at §§ 7-13-1610 through 7-13-1930. The statutes regarding machines are set forth on Exhibit A hereto. The statutes are extensive and address the issues raised by

Plaintiffs. The statutes include § 7-13-1140. Procedures when too many ballots found in box or too many votes tabulated, , § 7-13-1870, Procedure when voting machine becomes inoperative, and § 7-13-1620. Voting system approval process.

## ARGUMENT

I. Plaintiffs Lack Standing to Bring This Action.

Plaintiffs, through their own allegations, lack the basic, constitutional principle of standing. The principle of standing under the United States Constitution is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The Supreme Court has provided a three-part test to establish standing:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, **not 'conjectural' or 'hypothetical**,' " Second, there must be a **causal connection between the injury and the conduct complained of**-the injury has to be "fairly ... **trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court."** Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), 504 U.S. at 560-61 (internal citations omitted (emphasis added).

> The party invoking federal jurisdiction bears the burden of establishing" standing—and, at the summary judgment stage, such a party "can no longer rest on ... 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'

Clapper v. Amnesty Int'l USA, 568 U.S. 398, 411–12, 133 S. Ct. 1138, 1148–49, 185 L. Ed. 2d 264 (2013).

The Plaintiffs in this action have no "injury in fact" that is "concrete and particularized" and "actual or imminent." More specifically, they have no injury at all and instead allege

7

"hypothetical claims" including an express claim for a "theoretically possible" problem. The hypothetical vulnerabilities of which the Plaintiffs complain, if any occur, would be the result of "the independent action of some third party not before the court." Also, there is no dispute that the iVotronic Machines perform properly if they are not manipulated by third parties. The gist of the allegations of the Complaint is that the problems result from vulnerabilities that allow hackers to impact the results of the machines or that criminal behavior occurs at the polling place. Either of these, if they occur, are the actions of third parties and violate the second part *Lujan* test: "there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court."

As to anything approaching an articulation of damages, Heindel states in the Complaint at Paragraph 12 (emphasis added) that "He felt compelled to absorb these costs [independent investigations he voluntarily undertook] because **he believes** the state's voting system, and in particular its use of iVotronic machines, is deeply unreliable and fundamentally unverifiable. Mr. Heindel **reasonably believes that these unaddressed flaws impact his right to have his vote counted accurately."**

As to Leventis, as stated in Complaint Paragraph 13 (emphasis added):

> Based on his experiences as a state senator and South Carolina voter, Mr. Leventis has **longstanding concerns** about the accountability, auditability, and transparency of the iVotronic based system. He **reasonably believes** that the flaws in South Carolina's voting system burden his right to have his vote counted fairly and accurately.

The Supreme Court has "repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power." United States v. Hays, 515 U.S. 737, 743, 115 S. Ct. 2431, 2435, 132 L. Ed. 2d 635

(1995). As an initial matter, "for an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Lujan,* 504 U.S. at 560.

> "Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be "concrete." A "concrete" injury must be "*de facto*"; that is, it must actually exist. See Black's Law Dictionary 479 (9th ed. 2009). When we have used the adjective "concrete," we have meant to convey the usual meaning of the term—"real," and not "abstract." Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967). Concreteness, therefore, is quite different from particularization.

Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548, 194 L. Ed. 2d 635 (2016), as revised (May 24, 2016).

> A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations.

Cty. Court of Ulster Cty., N. Y. v. Allen, 442 U.S. 140, 154–55, 99 S. Ct. 2213, 2223, 60 L. Ed. 2d 777 (1979).

> In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.

Clapper v. Amnesty Int'l USA, 568 U.S. 398, 416, 133 S. Ct. 1138, 1151, 185 L. Ed. 2d 264 (2013).

> Respondents assert that they can establish injury in fact because there is an objectively reasonable likelihood that their communications will be acquired under § 1881a at some point in the future. But respondents' theory of *future* injury is too speculative to satisfy the well-established requirement that threatened injury must be "certainly impending."

Clapper v. Amnesty Int'l USA, 568 U.S. 398, 401, 133 S. Ct. 1138, 1143, 185 L. Ed. 2d 264 (2013).

Plaintiffs have not alleged a concrete injury from the use of the DRE machines. As set forth *supra*, Plaintiff Heindel "believes the State's voting system" and "reasonably believes these unaddressed flaws" and Plaintiff Leventis has "longstanding concerns" and "reasonably

believes." These are not concrete and relate to events that, if they occur, will manifest themselves in the future [the 2018 Election]. No relief is being sought for past elections.

No one doubts the sincerity or concerns of the two named Plaintiffs. However, beliefs and concerns do not arise to the level necessary to justify this Court substituting its judgement for that of the State for needed actions, if any. In fact, the Plaintiffs concede in Paragraph 11 of the Complaint that "The Constitution does not require Defendants to ensure perfectly error-free elections or impenetrable cyber-defenses."

## II. There is No Causal Connection Between Plaintiffs' Alleged Injury And Any of the State Defendants' Conduct.

Throughout the Complaint there are allegations such as "In South Carolina, the capacity of the state's election system to record and count votes reliably is deeply compromised by the state's unnecessarily vulnerable voting system." Paragraph 2, page 2 of 45. The voting recording and tabulation allegations all relate to the iVotronic Direct Recording Electronic ("DRE") system.

The essence of the allegations in this 45-page Complaint are set forth in Paragraph 6 (emphasis added) that:

> 6. The risks inherent in the state's election system have become only more acute in recent years, as demonstrated by numerous widely acknowledged attacks on election infrastructure starting in 2016. Against the backdrop of a surging set of **cyber-threats** designed to disrupt and undermine confidence in the democratic process, including **documented attacks by foreign nation-states** and a history of inadequate cyber safeguards in South Carolina, these vulnerabilities implicate the Plaintiffs' fundamental constitutional right to vote.

These are threats by third parties related to future events. Furthermore, the allegations in the Complaint about actual cyber attacks took place in other states and targeted voter registration systems or public facing websites, not voting systems. Even if Plaintiffs' alleged injuries were more than speculative, the injuries are still not traceable to any of the Defendants. Plaintiffs'

allegations about criminal interference with the voting system concern hypothetical third parties, not the Defendants. *Clapper,* 568 U.S. at 411 (holding that speculation about whether Plaintiffs would be subjected to surveillance under the challenged federal statute," or some other authority shows that [Plaintiffs] cannot satisfy the requirement that any injury in fact must be fairly traceable to" the challenged statute). Here, any injury would be traced to illegal hacking or surreptitious conduct by election officials, not the actual use of DREs. There is no dispute that when working properly, DRE machines record a vote in the same manner as it is cast. It is only hypothetical third-party interference that creates any potential injury to Plaintiffs.

Paragraphs 21 through 31 outline the operations of the DRE system in detail. For purposes of this Motion, nothing about the description of the operation is contested.

Paragraphs 32 through 37 outline how polling places are managed. These include the acknowledgment in Paragraph 33 that the SEC has policies in place directing poll managers to maintain the security of PEBs when in use by "mak[ing] sure they are not left unattended," followed by the allegation in Paragraph 34 that "On information and belief, however, poll managers often leave PEBs unattended as they carry out their many duties in managing polling sites." Nothing arises to any activity that has harmed the sanctity of Plaintiffs' votes.

The complaint cites numerous reports and studies about the iVotronic system. Many are more than a decade old and do not say anything about South Carolina. All are not mentioned in this review here but the key thing to realize is that these all emphasize vulnerabilities and the possibility of hacking. They do not establish, or allege, that any hacks or errors have resulted in causing improper election results to be certified in South Carolina. The process for protesting election results in South Carolina is not mentioned nor are statutory remedies for errors.

The reports can be classified into two broad types: (1) reports performed by non-South Carolina entities without examining South Carolina ("Non-South Carolina") and (2) reports performed by South Carolina entities analyzing South Carolina.

Some of the reports are outlined hereafter.

### Non-South Carolina Reports

There is a lot of discussion about a report commissioned in 2007 by the Ohio Secretary State (the "EVEREST Report"). See Complaint Paragraphs 39 through 53 and Complaint Exhibit 3. The allegations are that the Ohio Secretary of State commissioned several leading computer security and computer science experts to analyze the security of the voting systems used in that state, including the iVotronic. The Complaint ties the EVEREST Report to South Carolina in Paragraph 53 by stating that "South Carolina still conducts election using iVotronic firmware certified by the SEC in 2007 –the very firmware studied and exploited by the EVEREST researchers." Excerpts are attached as Exhibit 3 to the Complaint and are discussed in the Complaint in Paragraphs 38 through 52. The EVEREST REPORT concludes such things as (1) "The iVotronic system is plagued with vulnerabilities that undermine its reliability and open numerous pathways for potential hacking." Paragraph 38 and (2) "The architecture of the iVotronic system creates numerous inroads for potential hackers." Note that "open numerous pathways" and "numerous inroads for potential hackers" all require improper acts by third parties. South Carolina is not mentioned in the EVEREST excerpts in Exhibit 3.

The Florida Department of State commissioned a team of researchers at Florida State University ("FSU") to conduct an audit of the 2006 Florida Congressional District 13 election. *See* Florida State University, *Software Review and Security Analysis of the ES&S iVotronic 8.0.1.2 Voting Machine Firmware*, prepared for Florida Department of State, (Jan. 23, 2007),

https://people.eecs.berkeley.edu/~daw/papers/sarasota07.pdf, (hereinafter, "FSU Report"). The FSU Report is discussed in Paragraphs 54 through 57 in the Complaint. A search of the FSU Report does not turn up any references to South Carolina. Problems are identified but there are no conclusions with regard to South Carolina.

## South Carolina Reports

A superficially more problematic report is the South Carolina General Assembly's Legislative Audit Council Report (the "LAC Report"). The LAC report noted "Election Day mishaps" associated with the iVotronic system. The LAC report catalogued studies revealing the iVotronic's deep and systemic vulnerabilities, including the EVEREST and FSU Reports. Based on that review, the LAC's analysis described, among other things, instances in other states of "Vote Flipping," "Candidates missing from screens," "Missing Votes (Undervotes) and Too Many Votes (Overvotes)," and "Election Fraud." LAC Report at 19-20. See Paragraph 58 of the Complaint. The LAC Report, at page 13, however, concludes that "These are just a few of the reported errors in South Carolina, largely categorized as human errors rather than mechanical errors." See the LAC Report at page 13. The LAC Report also found that "Mechanical errors have occurred, such as battery failure and screen calibration, directly impacting voters' ability to vote timely and accurately." Page 14 of the LAC Report. Two years after the LAC Report, the General Assembly set out again to study the state's election system and concluded that fundamental aspects of it should be replaced. See Complaint at Paragraph 59. The Report (the "JRC Report") of the Joint Voting Research Committee more accurately stated the charge to the Committee as "evaluating different forms of voting systems and providing a recommendation as to which technology should be implemented in South Carolina." JRC Report, Conclusions and Findings. There are not conclusions that wrong election results were certified.

This is just a sampling of the allegations in the Complaint. However, reviews of the exhibits reveal, at best potential vulnerabilities and not evidence that elections have been wrongly decided. The Plaintiffs themselves concede in Paragraph 11 that "The Constitution does not require Defendants to ensure perfectly error-free elections or impenetrable cyber-defenses." Complaint, Paragraph 11.

The South Carolina National Guard Defensive Cyber Operations Element in October 2016, analyzed every South Carolina county. Complaint Paragraph 77. The attachment to the Complaint has assessments for Greenville, Sumter and Charleston counties. These assessments focused on three areas: physical security of election materials; Unity workstation configuration; and data-transfer methodologies; not on the voting machines themselves.. Complaint Exhibit 2.B, pages 3.   According to the Complaint, there were "critical vulnerabilities in 21 counties" and 21 counties had security vulnerabilities. This does not matter for purposes of this lawsuit. System vulnerabilities do not translate into concrete and particularized injury to confer standing on the Plaintiffs.

Paragraph 83 through Paragraph 93 set forth complaints about the ability to audit results, mainly related to a lack of a paper trail. None of this arises to concrete and particularized injury to Plaintiffs.

Starting in Paragraph 94 and continuing through Paragraph 114, Plaintiffs complain about the prospect of cyberattacks on our nation's electoral systems. Yet again, these are events caused by third parties and do not meet the requirements for standing set forth in the *Lujan* test and do not cause concrete and particularized injuries to Plaintiffs.

14

**BRIEF SUMMARY**

As set forth *supra*, Plaintiffs do not assert particularized and concrete injurie that give them standing before this Court. They also do not assert any aspects of discrimination or disparate treatment that would give them equal protection and due process claims.

**CONCLUSION**

Plaintiffs do not meet the constitutional standing requirements and Defendants ask this Court to dismiss this action with prejudice.

> Alan Wilson, Fed. Bar No. 10457
> W. Jeffrey Young, Fed. Bar No. 6122
> Robert D. Cook, Fed. Bar No. 285
> Thomas Parkin C. Hunter, Fed. Bar No. 2018
> Harley Littleton Kirkland, Fed. Bar No.
>
> OFFICE OF THE SOUTH CAROLINA ATTORNEY GENERAL
> Post Office Box 11549 Columbia, South Carolina 29211-1549
> jyoung@scag.gov
> bcook@scag.gov
> phunter@scag.gov
> hkitkland@scag.gov
>
> /s/ Thomas Parkin C. Hunter
> Senior Assistant Attorney General
> Attorneys for all Defendants

July 30, 2018

Columbia, SC