IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

|  |  |
|---|---|
| FRANK HEINDEL,<br>PHIL LEVENTIS,<br><br>     *Plaintiffs*,<br><br>*v.*<br><br>MARCI ANDINO, *Executive Director of the South Carolina State Election Commission, in her official capacity,*<br>BILLY WAY, JR., *Chair of the South Carolina State Election Commission, in his official capacity,*<br>MARK A. BENSON, MARILYN BOWERS, AND NICOLE SPAIN WHITE, *Members of the South Carolina State Election Commission, in their official capacity*,<br><br>     *Defendants*. | CASE NO. 3:18-cv-01887-JMC<br><br><br>SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS.**

This supplemental memorandum comes before the Court upon the South Carolina Election Commission's ("the Commission") recently issued Request for Proposals ("RFP"). On December 7, 2018, the Commission published an RFP to acquire a new statewide voting system that provides the basic features sought by Plaintiffs in their Complaint: "ballot marking devices and/or handmarked optical scan systems" which "shall include a paper record of each voter's selections" to be implemented beginning "July 1, 2019." (RFP at 18–19); (*See also* Compl. ¶ 10, 85). A copy of the RFP has been attached as Exhibit A to this supplemental memorandum. Based upon this new RFP, which effectively moots Plaintiffs' case and further demonstrates their lack of standing,

Defendants[1] file this supplemental memorandum to provide the Court with the pertinent information and relevant argument. Based upon the following, Defendants respectfully request the Court dismiss the lawsuit, or in the alternative stay the case until the new voting system is implemented.

## I. Argument

### A.    The Commission's Recently Filed RFP Effectively Moots Plaintiffs' Case

Mootness can be defined as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (quoting Henry P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 YALE L.J. 1363, 1384 (1973)) (quotations omitted).

> "[T]he doctrine of mootness constitutes a part of the constitutional limits of federal court jurisdiction," *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011) (alteration in original) (internal quotation marks omitted) (quoting *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008)), which extends only to actual cases or controversies, U.S. Const. art. III, § 2. When a case or controversy ceases to exist—either due to a change in the facts or the law—"the litigation is moot, and the court's subject matter jurisdiction ceases to exist also." *S.C. Coastal Conservation League*, 789 F.3d at 482.

*Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017). "Put differently, 'a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Id.* (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).

Here, on December 7, 2018, the Commission issued an RFP seeking a new statewide voting system. *See* Exhibit A. This RFP seeks a voting system that effectively moots Plaintiff's suit. Plaintiffs' Complaint asks the Court to declare South Carolina's election system unconstitutional

---

[1] It should be noted that all Defendant Commissioners listed in the caption have since been replaced by the Governor. Accordingly, under Federal Rule of Civil Procedure 25(d) the newly appointed Commissioners should be substituted going forward.

in violation of the Fourteenth Amendment, enjoin use of the State's current voting machines, and

compel the Commission to implement a voting system that "reliably records and tabulates votes"

(*i.e.* complies with the Fourteenth Amendment). (Compl. p. 44). Because of the new RFP, these

alleged issues are no longer "live" or ongoing for several reasons.

As a general matter, any machines acquired pursuant to the RFP will and must comply with

S.C. Code § 7-13-1640 (setting forth the voting machine requirements in line with Plaintiffs'

prayer for relief) and S.C. Code § 7-13-1620 (requiring the machines to be "certified by a testing

laboratory accredited by the Federal Election Assistance Commission as meeting or exceeding the

minimum requirements of federal voting system standards"). (RFP at 18).[2] The RFP here seeks

bids for a comprehensive statewide voting system solution consisting of either "ballot marking

devices and/or handmarked optical scan systems" that "shall include a paper record of each voter's

selections" to be implemented beginning "July 1, 2019." (RFP at 18–19).

> The Contractor will provide all technical and support services for the conduct of
> every election in the State beginning on January 1, 2020 and continuing through
> the 2020 General Election. This includes full onsite support for the Presidential
> Preference Primaries, June Statewide Primaries and runoffs, and the November
> General Election. Following the November 2020 General Election, the Contractor
> will provide ongoing support offsite.

(RFP at 19). In sum, the system currently sought by the Commission leaves a paper trail and will

be implemented in time for the 2020 presidential primaries—eliminating Plaintiffs' concerns

---

[2] The Court can take judicial notice of the RFP for the purposes of a motion to dismiss without converting it into a motion for summary judgment. *Papasan v. Allain*, 478 U.S. 265, 269 (1986) ("Although this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking notice of items in the public record . . . ."); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("In reviewing a Rule 12(b)(6) dismissal, we may properly take judicial notice of matters of public record."); *United States v. Savannah River Nuclear Sols., LLC*, No. 1:16-CV-00825-JMC, 2016 WL 7104823, at *8 (D.S.C. Dec. 6, 2016) (Childs, J.) ("[T]he court may take judicial notice of the RFP . . . because it is a matter of public record.").

regarding the reliability of the machines and the accuracy of tabulation for the upcoming elections. Moreover, the new voting system will not utilize the previously used voting machines referenced in Plaintiffs' complaint, making the allegations therein wholly irrelevant to the upcoming elections.

Further, Plaintiffs' Complaint is not saved by any exceptions to the mootness doctrine.[3] For example, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). "Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power." *Id.* Nevertheless, "[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968).

Here, even assuming that there is some sort of lurking constitutional injury in the pending use of the current voting machines, it is "not reasonable" to expect that the same constitutional injury would occur in the future with a new voting system that possesses the desired features articulated in Plaintiffs' Complaint. Stated differently, Plaintiffs' alleged injuries are prospective, hypothetical, and based upon potential third-party conduct to voting machines that will not be used in the upcoming elections. Assuming *arguendo* that Plaintiffs' possessed the requisite standing at the beginning of the suit (which they do not) and that the Commission's voting machines are

---

[3] The exception of "capable of repetition, yet evading review" is not implicated here because the Plaintiffs allege a prospective, albeit hypothetical, harm that has not yet occurred. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 735 (2008) (setting forth the standard for the "capable of repetition, yet evading review" exception).

currently in violation of the Fourteenth Amendment (which they are not), any alleged injury is still nonetheless prospective (with constitutional injuries only potentially occurring during the upcoming 2020 primaries and general elections). Plaintiffs' desire for a paper trail throughout the 2020 elections will be completely alleviated once the RFP process is complete and the system fully implemented.

While Plaintiffs will certainly contend that the RFP is non-binding, and could be withdrawn at any time, its issuance at the very least demonstrates that the Commission has been doing its job all along. The Commission is carrying out its duties to protect and provide the right to vote in accordance with state and federal requirements. Moreover, it demonstrates the Commission is doing everything that it can. As will be addressed in greater detail below, obtaining a new voting system is not as simple as obtaining a court order. There are statutes, regulations, and processes in place that must be adhered to before a new voting system can be procured. The Commission, on its own volition and separate from the instant litigation, has and is doing everything it can—as quickly as it can—to ensure that South Carolinians continue to enjoy a reliable and accurate voting system. Accordingly, if the Court is not persuaded to dismiss the lawsuit outright, the Court should, at the very least, issue a stay of the case until the new voting system is implemented, authoritatively mooting the case.[4]

---

[4] In the unlikely event that the RFP is withdrawn, Defendants and Plaintiffs can immediately report back to the Court, the stay can be lifted, and Plaintiffs can immediately file for a Temporary Restraining Order pursuant to Federal Rule of Civil Procedure 65 to obtain the injunctive relief they request.

**B.**    **Plaintiffs' Lack Standing Because Any Alleged Injury Cannot Be Redressed by a Favorable Decision[5]**

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014) (citations omitted) (emphasis added). "Relaxation of standing requirements is directly related to the expansion of judicial power." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408–09 (2013) (quoting *United States v. Richardson,* 418 U.S. 166, 188 (1974) (Powell, J., concurring)) (quotations omitted). "To establish Article III standing, a plaintiff must show . . . a 'likelihood' that the injury 'will be redressed by a favorable decision.'" *Id.* (citing *Lujan*, 504 U.S. at 560–61). "[T]he redressability prong entails that it must be likely, and not merely speculative, that a favorable decision will remedy the injury." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) (citing *Lujan*, 504 U.S. at 561). "The redressability requirement ensures that a plaintiff 'personally would benefit in a tangible way from the court's intervention.' A plaintiff seeking injunctive relief shows redressability by 'alleg[ing] a continuing violation or the imminence of a future violation' of the statute at issue." *Id.* at 162 (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975); *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 (1998)) (alteration in original).

This is not a typical constitutional law case, where the plaintiff is challenging the constitutionality of a statute or whether a particular state actor acted in an unconstitutional manner. Rather, here Plaintiffs challenge the whole statewide voting system, contending it is unconstitutional based on potential, future third-party conduct. Plaintiffs do not challenge any state

---

[5] "A litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance." *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004); *Mirant Potomac River, LLC v. U.S. E.P.A.*, 577 F.3d 223, 226 (4th Cir. 2009) (noting that standing is a subject-matter jurisdiction issue).

statute or any affirmative unconstitutional conduct by specific state actor. Accordingly, Plaintiffs'

prayer for relief, asking the Court to exercise its equitable power, is broad and sweeping:

> 2. Declare that the Defendants' failure to provide an elections system that has basic safeguards to ensure that the Plaintiffs' votes are reliably and accurately counted violates Plaintiffs' fundamental right to vote as protected by the 14th Amendment to the U.S. Constitution;

> 3. Enjoin Defendants from maintaining an election system that fails to reliably record and tabulate votes;

> 4. Impose injunctive relief requiring Defendants to ensure that Plaintiffs have access to a voting system that will reliably and accurately record and count their votes;

(Compl. p. 44).[6]

Notably, the Complaint makes only a passing reference to the myriad of state statutes and

regulations dictating how the Commission is to act, and fails to emphasize that the procurement

code mandates how all new voting systems must be obtained. For instance, the Commission is

required to:

> (1) either approve and adopt one voting system to be used *by authorities charged by law* with conducting elections, or approve and adopt multiple voting systems if the commission, in its discretion, determines not to adopt one voting system;

> (2) support the authorities *charged by law* with conducting elections by providing basic level training for personnel in the operation of the voting system approved and adopted by the commission;

> (3) support all aspects of creating the ballots and the database of the voting system that is approved and adopted; and

___

[6] The full prayer also includes the following requests:

> 1. Assume jurisdiction over this action;

> . . . .

> 5. Award the Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

> 6. Any other relief the Court deems appropriate.

(Compl. p. 44).

(4) comply with the provisions of Chapter 35 of Title 11 [(the South Carolina Consolidated Procurement Code)] in procuring a voting system or systems, as defined in subsection (A).

S.C. Code Ann. § 7-13-1655. The Commission is endowed with the *sole* authority for approving, adopting, and procuring a voting system and must do so according to the established statutory scheme. Yet Plaintiffs seek to use the Court to implement their vision and desires for statewide elections—irrespective of the statutory and regulatory scheme implicated by their prayer for relief.

To that end, even if the Court were to grant Plaintiffs a favorable decision, it would be unlikely to redress any of their alleged injuries. This is best illustrated by the litany of legitimate questions raised by Plaintiffs' prayer for relief: How will the Court enjoin Defendants "from maintaining an election system that fails to reliably record and tabulate votes"? Is the Court going to engage in the "extraordinary" remedy of overseeing the Commission directly until implementation? *See, e.g., Missouri v. Jenkins*, 495 U.S. 33, 51 (1990) (recognizing the "extraordinary" and "drastic" nature of a district court imposing a tax increase in the context of desegregation, and that while the district court should not "grant local government *carte blanche*" it should still afford officials "the opportunity to devise their own solutions" to the problems of desegregation).

What happens if a new system cannot be obtained before the next election, but the Commission is enjoined from using the prior voting machines? Is the election to be postponed? *See* S.C. Code Ann. § 7-13-10 *et seq*. If not, how would the election be administered? Would it compel the Commission to restart the procurement process already in motion? *See* Exhibit A. Would the Court's ruling preempt or overrule Defendants' obligations under the State's procurement code? *See* S.C. Code Ann. § 7-13-1655(B)(4); S.C. Code Ann. § 11-35-40(2). Would

a favorable decision implicitly overrule as unconstitutional the State statutes utilized to procure the current, allegedly unconstitutional, machines? *See* S.C. Code Ann. § 7-13-1655(B)(1)–(3).

Further, if the Court orders the Commission to "ensure that Plaintiffs have access" to a reliable and accurate voting system, who determines what is sufficiently reliable and accurate? The Plaintiffs? The Court? Both? (Compl. ¶ 124 (recognizing that "the Constitution does not require perfect accuracy or impregnable safeguards in its election systems . . . .")). Does the new voting system have to simply be more "reliable" than the current system or the most reliable possible? What if a new "reliable and accurate" voting system is procured and implemented, but it is not the kind Plaintiffs like or from the vendor they prefer? Would the Court mandate a particular model of voting machine that Defendants must obtain?

Will the Court order compliance and subject to Commission to show cause hearings whenever Plaintiffs "reasonably believe" their votes are not being reliably or accurately counted? How long will the Court Order be in effect? Through implementation? Through 2020? Indefinitely? If the Court orders a new voting system be utilized, is the Court going to order the state legislature to appropriate the millions of dollars necessary for a new system? *Cf. Tolman v. Finneran*, 171 F. Supp. 2d 31, 37 (D. Mass. 2001) ("The Court has found no cases where a court has issued prospective injunctive relief against state legislators—either in their official or individual capacity—to require them to pass legislation to remedy a constitutional violation."). If the legislature does not appropriate the money, can the members of the Commission be held in contempt for failing to follow the Court's order? What if Plaintiffs later discover that the newly procured voting system, initially in compliance with the Court's order, is no longer the most reliable or accurate voting system? Could the Commission be held in contempt then after initially complying with the order?

The list of questions regarding how the Court could even possibly fashion relief is vast, and warrants a return to the United States Supreme Court's established position: "*States retain the power to regulate their own elections*." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (emphasis added). Further, the Supreme Court has emphasized that the Court's equitable remedial powers must be "adequate to the task" and "are not unlimited." *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971)). "[A]lthough federal district courts have been allowed—indeed, at times constitutionally required—to intrude in the affairs of state and local governments, such intervention has been conducted with the clear understanding that the autonomy of these governmental entities should be safeguarded to the maximum extent possible." *Langton v. Johnston*, 928 F.2d 1206, 1221 (1st Cir. 1991). Considering the recent RFP and the Commission's continued dedication to achieving reliable and accurate voting, this Court should be loath to assume such a role over the Commission. Stated differently, the Court does not need to order the Commission to procure new voting machines, the Commission, in accordance with its statutory duties, is already well on its way to obtaining a new voting system in time for the 2020 elections.

As the recently issued RFP makes clear, the Commission is doing its job in procuring a voting system that continues to reliably and accurately tabulate each citizen's valuable vote. This effectively moots Plaintiffs' lawsuit. Yet even if it did not moot the lawsuit, the myriad of State statutes and regulations prevents the Court from providing the Plaintiffs any meaningful relief with a favorable judgment. Instead, the Commission itself would have to begin the process by issuing an RFP in line with any Court order, something it has already done. Accordingly, given the virtual impossibility of the Court being able to fashion any kind of equitable relief in the event of a favorable decision, the Court should dismiss this case for a lack of standing.

C.      **Plaintiffs Allege an Impermissible "Generalized Grievance" and thus Lack Standing**

"The prohibition on a plaintiff seeking redress for a 'generalized grievance' has often been" considered a prudential requirement for standing. *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 544 (6th Cir. 2004) (collecting cases). "Standing doctrines reflect in many ways the rule that neither citizens nor taxpayers can appear in court simply to insist that the government and its officials adhere to the requirements of law." Wright & Miller, *Citizen Suits*, 13B Fed. Prac. & Proc. Juris. § 3531.10 (3d ed.). "Whether styled as a constitutional or prudential limit on standing, the Court has sometimes determined that where large numbers of Americans suffer alike, the political process, rather than the judicial process, may provide the more appropriate remedy for a widely shared grievance." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23 (1998) (holding that Congress has the constitutional power to confer jurisdiction on the federal courts to adjudicate voting rights issues pertaining to a political committee's failure to produce donor and campaign related information).

When one steps back and looks at the Commission's conduct against the backdrop of Plaintiff's Complaint, it becomes apparent that the instant suit is really nothing more than a generalized grievance to voice concerns over an alleged, "reasonably believed" fear of a potential future constitutional violation. As demonstrated in Defendants' initial memorandum in support of their motion to dismiss and for summary judgment, Plaintiffs lack any kind of concrete, particularized injury. As demonstrated above, in light of the statutory scheme and the recently issued RFP, a favorable decision by the Court could not afford the Plaintiffs any meaningful relief. Accordingly, Plaintiffs' Complaint merely asserts a "generalized grievance" when it alleges such a non-particularized injury and seeks a Court order compelling the Commission to follow the law (which it has done and is currently doing with the RFP). *See also* S.C. Code § 7-13-1640(A)(6)

(requiring any voting machine approved by the Commission must "correctly register or record and accurately count all votes cast for any and all candidates and for or against all questions . . . .").

For the Court to sustain such a lawsuit would be inappropriate. This case is not like *Atkins*, where Congress had conferred on the Court jurisdiction to hear the plaintiffs' broad voting rights issue. *Akins*, 524 U.S. at 22.[7] Rather, Plaintiffs fail to point to any specific federal statute conferring jurisdiction for the specific harm alleged, only a general constitutional provision (the Fourteenth Amendment) and their "reasonable beliefs" that the Commission potentially was or could be acting unconstitutionally. Further, this case is not analogous to the Supreme Court's racial-gerrymandering precedents, which have broadly conferred standing on residents in affected districts. *Shaw v. Hunt*, 517 U.S. 899, 904, (1996) ("[W]e recognized that a plaintiff who resides in a district which is the subject of a racial-gerrymander claim has standing to challenge the legislation which created that district, but that a plaintiff from outside that district lacks standing absent specific evidence that he personally has been subjected to a racial classification."). Here, Plaintiffs' injuries are not confined to a single district with specific evidence of an unconstitutional acts. Rather, Plaintiffs have alleged injuries occurring statewide with only speculation and hypothetical intimations of potentially unconstitutional results.

---

[7] The Court stated in *Atkins*,

> Here, there is no constitutional provision requiring the demonstration of the "nexus" [between the status asserted and the claim sought to be adjudicated] the Court believed must be shown in *Richardson* and *Flast.* Rather, there is a statute [the Federal Election Campaign Act of 1971] which, as we previously pointed out, *supra,* at 1783, does seek to protect individuals such as respondents from the kind of harm they say they have suffered, *i.e.,* failing to receive particular information about campaign-related activities.

*Atkins*, 524 U.S. at 22.

Illustrative here is the case of *U.S. v. Richardson*. In *Richardson*, the plaintiff brought suit against the U.S. Government alleging that the public reporting of expenditures, or lack thereof, under the Central Intelligence Agency Act was unconstitutional.[8] *United States v. Richardson*, 418 U.S. 166, 168 (1974). "In essence, the respondent asked the federal court to declare unconstitutional that provision of the Central Intelligence Agency Act which permits the Agency to account for its expenditures 'solely on the certificate of the Director . . . .' 50 U.S.C. s 403j(b)." *Id.* at 169. "The only injury alleged by respondent was that he 'cannot obtain a document that sets out the expenditures and receipts' of the CIA but on the contrary was 'asked to accept a fraudulent document.'" *Id.*

The Supreme Court held the plaintiff lacked standing because his complaint alleged merely a generalized grievance. *Id.* at 176. The Court reasoned the plaintiff's complaint was surely a "kind of a generalized grievance . . . since the impact on him is plainly undifferentiated and 'common to all members of the public." *Id.* The Court recognized that while the plaintiff had "a genuine interest in the use of funds and that his interest may be prompted by his status as a taxpayer, he has not alleged that, as a taxpayer, he is in danger of suffering any particular concrete injury as a result of the operation of [the] statute." *Id.* The Court then looked to its precedent in *Ex parte Le vitt* to further illustrate its point:

> There Le vitt sought to challenge the validity of the commission of a Supreme Court Justice who had been nominated and confirmed as such while he was a member of the Senate. Le vitt alleged that the appointee had voted for an increase in the emoluments provided by Congress for Justices of the Supreme Court during the term for which he was last elected to the United States Senate. The claim was that the appointment violated the explicit prohibition of Art. I, s 6, cl. 2, of the Constitution. The Court disposed of Le vitt's claim, stating:

---

[8] While Plaintiffs have not asserted taxpayer standing here, the referenced precedents are still instructive for addressing standing and generalized grievances generally.

> 'It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public.' 302 U.S., at 634, 58 S.Ct., at 1. (Emphasis supplied.)

> Of course, if Le vitt's allegations were true, they made out an arguable violation of an explicit prohibition of the Constitution. Yet even this was held insufficient to support standing because, whatever Le vitt's injury, it was one he shared with 'all members of the public.'

*Id.* at 177–78 (quoting *Ex parte Levitt*, 302 U.S. 633, 636 (1937)). The Court went on to conclude: "The acceptance of new categories of judicially cognizable injury has not eliminated the basic principle that to invoke judicial power the claimant must have a 'personal stake in the outcome,' or a 'particular, concrete injury,' or 'a direct injury,' in short, something more than 'generalized grievances.'" *Id.* at 179–80 (citations omitted); *see also Clapper*, 568 U.S. at 409 (recognizing that any alleged future injury must not be "too speculative" and must be "certainly impending").

Likewise here, any South Carolinian who voted or will vote could have filed Plaintiff's Complaint. As discussed above and previously, Plaintiffs cannot point to any allegations in their Complaint articulating particular, certainly impending constitutional injuries specific to themselves. Accordingly, because the allegations could be shared by "all members of the public," it should be considered a generalized grievance, insufficient to confer standing.

"Were the federal courts merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding, the concept of "standing" would be quite unnecessary. But the 'cases and controversies' language of Art. III forecloses the conversion of courts of the United States into judicial versions of college debating forums." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982). While the allegations in Plaintiffs' Complaint might make for interesting academic

discussion, they nonetheless fail to allege anything beyond a generalized grievance and should therefore be dismissed.

## II. Conclusion

In conclusion, the Court should dismiss this case because Plaintiffs lack standing. Defendants have issued an RFP for a new voting system, one with a paper record of each voter's selections, that effectively moots the case. Moreover, Plaintiffs lack standing to bring the suit because a favorable decision would not redress Plaintiffs' alleged injury. The Commission is currently bound by a web of statutes and regulations that dictate how a new voting system is to be procured and implemented. Indeed, as is evidenced by the recently issued RFP, this process is ongoing and will be completed before the upcoming 2020 primaries. Stated plainly, the Court does not need to issue an order compelling the Commission to obtain new voting machines—the process is well under way. Accordingly, Defendants respectfully request that this court dismiss the instant case or, in the alternative, stay the case until the new voting system is implemented.

[Signature block on the next page.]

Respectfully Submitted,

ALAN WILSON
ATTORNEY GENERAL
Fed. Bar No. 10457

W. JEFFREY YOUNG
CHIEF DEPUTY ATTORNEY GENERAL
Fed. Bar No. 6122

ROBERT D. COOK
SOLICITOR GENERAL
Fed. Bar No. 285

THOMAS PARKIN C. HUNTER
SENIOR ASSISTANT ATTORNEY GENERAL
Fed. Bar No. 2018

HARLEY LITTLETON KIRKLAND
ASSISTANT ATTORNEY GENERAL
Fed. Bar No. 12397

WESLEY AARON VORBERGER
ASSISTANT ATTORNEY GENERAL
Fed. Bar No. 12912

SOUTH CAROLINA ATTORNEY GENERAL'S OFFICE
Post Office Box 11549
Columbia, South Carolina 29211-1549
jyoung@scag.gov
bcook@scag.gov
phunter@scag.gov
hkirkland@scag.gov
wvorberger@scag.gov

/s/ Wesley A. Vorberger
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR ALL DEFENDANTS

January 4, 2018
Columbia, SC